BROWN, C.J.
1 iPlaintiff, Callie Danielle Blake, has appealed from a judgment denying her request for authority to relocate her minor child, Noah,[1] who was four years old at the time of trial, to the Pensacola area of Florida. For the following reasons, we reverse the trial court’s judgment and grant the motion to relocate.
FACTS AND PROCEDURAL HISTORY
Plaintiff and defendant, Brandon Paul Morris, were never married. They had a short relationship and are the' biological parents of the child. Immediately after *1278 Noah’s birth, the couple and the baby lived •with Callie’s parents in Many, Louisiana, until Noah was approximately four months old. Brandon moved out and allegedly lived in Ruston, Louisiana, with his parents while the mother, Callie, and Noah continued living with her parents in Many, Louisiana. On May 17, 2012, the parties were granted joint custody of their child in a consent judgment for custody, visitation and child support in the 11th Judicial District Court in Sabine Parish.
The- consent judgment provided for Brandon’s visitation until Noah reached the age of one. After that, the parties were required to “work together, in a reasonable and concerted manner, on a progressive visitation schedule [which would allow defendant] overnight visitation and [provide] a schedule for [certain] holidays and for the minor child’s birthday.”
|aOn June 2, 2016, Callie filed a petition for rule nisi for authorization to relocate the child’s residence to Gulf Breeze, Florida.[2] Plaintiff was about to graduate and earn a master’s degree in occupational therapy, and she had job offers in Gulf Breeze. Plaintiff was also engaged to be married to Roy Peterson,[3] who resided and owned a business in Gulf Breeze.

Synopsis of Trial Testimony

A trial was held on the rule nisi on August 18, 2016. Plaintiff testified that she was primarily responsible for raising and seeing to Noah’s basic needs. Callie stated that she wanted to move to Gulf Breeze because she had a job opportunity there, and it was where Mr. Peterson lived and owned a business. Callie stated that she had not tried to find a job in the Shreveport area because she had heard from colleagues that the market was over-saturated and finding work in her particular field, pediatric occupational therapy, would be difficult.
Callie stated that Brandon had been present for few “events” in their son’s life, such as school plays, doctor’s visits, and Halloweens, having been provided with advance notice of the dates when those events were taking place. However, later on Callie stated that she had not informed Brandon of all of Noah’s school events “because we don’t get along, and he has consistently been verbally abusive and disrespectful to me.” She also asserted that Brandon was known to have attitude changes that “made me |3very uncomfortable and made me feel unsafe.” Callie, however, stated that Brandon had never been violent towards her.
Callie also testified that she had not informed Brandon of doctor’s visits because he stopped going to the appointments when Noah was an infant. She did state that she kept Brandon apprised of Noah’s medical status. Callie said that Brandon had been present when their son had surgery in 2016.
Plaintiff asserted that she and Brandon had established, via a verbal agreement around the time Noah turned one, that Brandon would have their son every other weekend. Brandon rebutted her claim that they had such an agreement. Callie also provided documentation showing that Brandon had exercised visitation and had seen Noah a total of 36 days in 2015 and 36 days as of the trial date in August 2016.
Callie attributed the few number of days that Brandon had exercised visitation to his unpredictable work schedule, which required him to be out of town for days and weeks at a time. She stated that Brandon would often miss times that they had scheduled for him to visit Noah because *1279 defendant would have to work instead. Callie added that Brandon would want to see their son on short notice, which would have required her to rearrange her plans to accommodate him. Callie stated that she had been willing on many occasions to change the visitation schedule, but there were times she refused to do so because Brandon did not give her sufficient notice.
Callie stated that she wants Noah to have his father in his life. She later went on to state, “[It’s] upon [Brandon] for him to spend time with his child. That’s not my job or [Mr. Peterson’s] job.” Callie proposed a | ¿visitation schedule which would allow Brandon to see Noah one week each June, July, and August, and part of Thanksgiving or part of Christmas depending on the year. Callie asserted that since Brandon had seen his son “irregularly and infrequently,” the proposed visitation schedule would “be more than what Brandon has seen him this past year.”
Callie testified that Brandon has always paid his support obligations and had, on occasion, provided additional money for Noah without a court order. Callie testified that when Brandon texted her and stated that they should get rid of the every other weekend visitation plan, they never discussed a new visitation schedule and that “Brandon just lets me know when he’s home, and if it works, it works.”
Callie stated that if she were allowed to move to Florida, she would want a visitation plan in place for Brandon, and would apprise him of any school events and doctors’ visits Noah would have. She testified that she wants Noah to have a relationship with his father.
Brandon testified that he works as a welder constructing refinery storage tanks, which requires that he work out of state and away from Ruston, where he allegedly lives. The amount of time defendant is out of town for his job varies from a few days to three or more weeks. Brandon acknowledged that Callie has been the primary caregiver for Noah. Brandon testified that he had not filed to have primary custody of Noah. Brandon said that if the trial judge denied relocation and Callie moved to Florida without Noah, then “my whole life would change, buddy.” Brandon emphatically stated he would not quit his job.
IsWhen his son was born in December 2011, Brandon was working in North Louisiana. In 2012, he took a job with ML Smith that required him to travel and has worked for ML Smith ever since. Brandon has worked in Oklahoma, Michigan, Texas, Alabama and South Louisiana along the I-10 corridor. Brandon testified that he has worked jobs where he was closer to Pensacola than he was to Ruston. Brandon stated that he intended to continue in his current job with its indeterminate schedule regardless of whether he was awarded custody.
Brandon stated that his mother is terminally ill with ALS, and his father still works. He stated that he would not leave the child with them but “would line something up.” Further, Brandon has no home. Casey Walker, Brandon’s girlfriend, testified that he lived with her in West Monroe from November 2014 until August 2016, just two weeks before trial. During this time, whenever Brandon had Noah, they stayed with her in West Monroe or Brandon got a motel room in Shreveport. Brandon denied living with Walker, but admitted that he and Noah had stayed with her overnight.
Brandon acknowledged that Callie has been an excellent mother to their son. When asked whether there were times when he requested to see his son and Callie refused, Brandon responded, “Probably,” and “[T]here’s probably been some. I don’t remember.” When asked to provide specific months or dates where such a *1280 refusal occurred, Brandon was unable to do so.
Brandon answered in the affirmative when asked if his life since 2013 centered on his job. When asked what his schedule was for the next week, Brandon stated that he had a job in Corpus Christi, Texas, “if I opt to do it,” which he speculated would last for about one month. Brandon stated that |nusually he does not have the option of what jobs he can take; his ability to choose usually occurs when work gets slow within the company. Brandon stated that his job after the. one in Texas would be in Arkansas.,
Brandon testified that he had seen Noah in a motel. Brandon had texted Callie stating that he (Brandon)' was upset that “my son thinks we live in a hotel.” Brandon stated that staying in a motel provided him with more one-on-one time with Noah, and they were able to use the swimming pool at the motel.
Brandon testified that he worked hard because he wanted to take care of Noah financially. He stated that communication between himself and Callie had been “bad between us,” and that she was jealous, angry, and not cooperating with him regarding visitation with Noah. She would deny him visitation when he was in town, and she did not have plans. Brandon stated that Callie dictated visitation times to him. Brandon often had “face” time and phone conversations with Noah.
Brandon’s former girlfriend, Casey Walker, testified, as did Brandon’s friend, Michael Colley, that Callie “called the shots” with regard to when Brandon was able to see Noah. None .of Brandon’s family testified on his behalf.
Brandon stated that he felt like Callie made it more difficult for him to have a relationship with his son, which was a concern he had regarding the proposed move to Florida. Brandon testified he would not be able to participate in his . son’s life as much if he were .living in Florida.
Brandon stated that he would like to be more involved in his son’s life and attend every event that' Noah has. Brandon testified that he had seen RNoah for one Christmas, one Easter, two Halloweens, and his first birthday party. Brandon testified that he had never tried to acquire information about Noah’s preschool and did not know who Noah’s teachers were. Brandon testified that he was aware of Noah’s medical conditions, but he did not know the name of his doctor and had never taken Noah to a doctor’s appointment.
Brandon testified that he had taken his son to ride all-terrain vehicles at Muddy Bottoms ATV Park three times. He said that Callie had objected to him taking Noah there because there was drinking and inappropriate activity at Muddy Bottoms. Brandon stated that at certain hours such behavior would occur, but he would always protect his son.
Mr. Peterson testified about his business and home, both located in Gulf Breeze. He stated that his home has .four bedrooms, and Noah already has a room there and has met the neighborhood kids. Mr. Peterson stated, that his business generated more than $2.5 million in sales last year. Mr. Peterson testified that he loved Noah and wanted to be. a good stepfather. Mr. Peterson said that he had called Brandon to introduce himself and show Brandon respect as Noah’s father,
Mr, Peterson described Brandon as “aggressive” and said that “he tries to intimidate” Mr. Peterson. Mr. Peterson testified that Brandon- was not someone he would spend a lot of time with, and Brandon had not “earned his respect.” Mr. Peterson testified that he did not want to interfere in Noah’s relationship with his father.
Plaintiffs mother, Sharon Blake, testified that Callie is a wonderful mother to *1281 Noah and was primarily responsible for his care. Sharon testified | sthat she would care for Noah while Callie was in school, before and after Noah went to preschool, about four days a week. Sharon testified that it was hard to get Brandon to commit to a schedule regarding visitation with Noah, and he would wait until the last minute to notify Callie that he wanted to see Noah. She stated that Callie would try to accommodate Brandon as to visitation.
Sharon Blake stated that she had seen Callie encourage Noah to call his father, but not on a daily basis; she stated that she did not think it was her daughter’s job to encourage Noah to contact his father. Sharon stated that she did not believe her grandson living in Florida would impair their relationship, and Mr. Peterson would treat Noah with respect and love. John Blake’s, testimony was similar to that of his wife.
The trial court issued its judgment and oral reasons for judgment on August 31, 2016, denying plaintiffs request to relocate with the child.
DISCUSSION
A parent seeking to relocate the principal residence of the child is required to show: (1) the request for relocation is made in good faith; and (2) the move is in the best interest of the child. La. R.S. 9:355.10; Hernandez v. Jenkins, 12-2756 (La. 06/21/13), 122 So.3d 524. A reviewing court may not set aside a trial court’s factual findings in the absence of manifest error or unless it is clearly wrong. Owens v. Owens, 14-165 (La. App 3 Cir 06/04/14), 140 So.3d 865.
La. R.S. 9:355.14(A) provides twelve factors which the court must consider in determining whether the proposed relocation is in the best |flinterest of the child as well as other relevant factors.[4] There is nó re *1282 quirement that the court give preferential consideration to any factor. Gray v. Gray, 11-0548 (La. 07/01/11), 65 So.3d 1247.
Among the factors considered when examining the best interest of the child, the courts may look to La. C.C. art. 134.[5] Where the trial court has 11(1considered the factors listed under La. R.S. 9:355.14 in determining whether relocation is in the best interest of the child or children, the court’s determination is reviewed for abuse of discretion. Hernandez, supra.
In the instant case, the trial court determined that the mother satisfied the first part of her burden under La. R.S. 9:355.10 by establishing that the request for relocation was made in good faith. We agree, moving to Florida to live with her future husband and work in her chosen field of employment puts Callie in good faith. See Hernandez, supra.
We now turn to the question of whether Callie proved that the relocation is in Noah’s best interest. Although it considered each factor as required by R.S. 9:355.14, the trial court failed to give sufficient weight to Noah’s relationship with his mother and the resulting benefits from relocation. The trial court gave disproportionate weight and misapplied two factors—numbers three and five. As such, the court abused its discretion and was clearly wrong and manifestly erroneous,
(3) La. R.S. 9:S55.U(A)(3): The feasibility of preserving a good relationship between the non-relocating person and the child through suitable physical custody or visitation arrangements, considering the logistics and financial circumstances of the parties.
The trial court found that this was a central factor in this case, noting that if the child is allowed to relocate to Florida, he would be a considerable | n distance from his father. The court then reasoned that financially and logistically, preserving the relationship between Noah and Brandon would become difficult. It is noted that the trial court specifically expressed that Callie’s move to Florida would make it “more difficult” for Brandon to visit with the child. The trial court delineated this as the central reason in denying Callie’s request.
The very essence of the Relocation Statute, La. R.S. 9:355.1, et seq., is to address the predictable difficulties expected with a *1283 potential move. The trial court’s reliance on it being “difficult” on defendant is misplaced as that factor, if singularly relied upon, would in effect lead to a jurisprudential repeal of the relocation statute. All interstate visitations pose difficulties, but that factor cannot stand alone as the only consideration, especially in our mobile society.
The court did not take into consideration the fact that Brandon travels extensively for his work. In that vein, he should also be able to travel to visit his son. In fact, Brandon’s work along the 1-10 corridor and in Alabama is closer to Pensacola than Ruston. Brandon has no home and often sees his son at a motel. Additionally, Callie testified that she would assist in making sure Noah would be able to visit with his father and would transport Noah to a halfway meeting point between the parties’ respective locations.
The trial court was also concerned with testimony as to the wealth of Mr. Peterson, and the fact that there was no evidence submitted regarding the coverage of expenses if relocation were permitted. Mr. Peterson testified as to his wealth and personal finances, but the court noted that “no tangible | ^evidence was submitted” to show proof of income that would afford Noah a higher financial quality of life. However, nothing was offered in opposition to Mr. Peterson’s testimony; therefore, his testimony that he has a thriving business and a four-bedroom home remains uncontradicted and unrefuted.
The evidence showed without question that the relocation will have a positive impact economically and educationally for Noah. There will be a family unit with both husband and wife working. Noah is now starting school and needs a stable and caring environment, not an erratic, inconsistent and unpredictable situation.
In this respect the trial court clearly misread and disproportionally weighed the facts.
(5) La. R.S. 9:355.14(A)(5): Whether there is an established pattern of conduct by either the person seeking or the person opposing the relocation, either to promote or thwart the relationship of the child and the other party.
The court stated that this was a significant factor in this case. The court referenced the approximately 250 pages of text messages submitted by the parties, which spanned nearly two years from August 16, 2014, to August 7, 2016. The court stated that those messages reflect that initially Callie was forthcoming in providing Brandon with information about the child, but the messages show that Callie became frustrated with Brandon’s work schedule and having to accommodate him in order for him to exercise any visitation with the child.
The messages do show Callie’s increasing level of frustration with Brandon. Nevertheless, the messages and Callie’s testimony show that Brandon often required Callie to accommodate him at the last minute so that he could visit with Noah.
| iaThe original consent custody judgment states that after Noah reached the age of one “the parents will work together, in a reasonable and concerted manner, on a progressive visitation schedule.” It appears from Callie’s and Brandon’s testimony and the text messages that Callie was the only parent trying to implement the court order regarding visitation. Brandon seems to have prioritized his work over trying to establish a regular schedule for shared custody and a consistent program of visitation.
The testimony of Callie and the text messages show that she would often go to *1284 extensive lengths to accommodate Brandon regarding visitation, meeting him halfway between her home and his location, as well as being flexible with his work schedule. Callie, Mr. Peterson, and both of Callie’s parents testified that it is important for Brandon to be involved in his son’s life. The text messages show that on multiple occasions, Brandon told Callie that he would withhold child support if he did not get the visitation he wanted. One example of such a communication is as follows:
Brandon: What r ur plans for the 4th .
Callie: I’m going out of town
Brandon: So if I’m in I can keep him
Callie:- You most def cam That is your weekend anyway •
Brandon: I ■ dnt even go by weekends anymore. I go by when I am home. We might as well throw that out the window. If that’s the case I have a bunch of weekends to catch up on.
The trial court was clearly wrong and abused its discretion in finding that Callie would not work with Brandon regarding visitation.
(lj La. R.S. 9;355.14(A)(1): The nature, quality, extent of involvement, and duration of the relationship of the child with the person proposing relocation and with the non-relocating | ^person, siblings, and other significant persons in the child’s life.
Noah has primarily' resided with his mother, Callie, since birth and has received extensive support from her family; Brandon has not been the primary caregiver of the child and has seen Noah only 36 days in 2015 and 36 days as of the time of the trial in 2016. However, the text messages submitted as evidence indicated'that the child missed his father while he was away, and Callie would let Noah know that Brandon missed him in return. The maternal grandparents testified as to their relationship with Noah, both stating that they enjoyed the time the child lived with them and assisted their daughter in the child’s care, and they did not believe that their relationship with Noah would be diminished. ...
(2) La. R.S. 9:355.U(A)(2): The age, developmental stage, needs of the child, and the likely impact the relocation will have oh the child’s physical, educational, and emotional development.
The court stated that the child was 4 years old (at the time judgment was rendered) and needed to have a relationship with both parents. Callie testified that Noah completed a preschool program in Shreveport and had done well there. The court stated that the child had more of a relationship with his mother, but that it was important for his emotional development for him to have a relationship with his father as well.
(4) La. R.S. 9:355.U(A)(4): The child’s views about the proposed reloca-tio% taking into consideration the age and maturity of the child.
The court-said that because Noah was 4 years old at the time judgment was rendered, he was too young to express a preference regarding relocation. We agree.
Iib(6) La. R.S. 9:355.14(A)(6): How the relocation of the child will affect the general quality of life for the child, including ■ but not limited to financial or emotional benefit and educational opportunity.
It was proposed to the court that the child’s life would be positively impacted financially via education benefits, and if the child were allowed to ■ relocate, he would live in a tworparent home after the marriage. Callie testified that,she will be *1285 working part-time in order to help Noah adjust to his life in Florida. Mr. Peterson and Callie testified that Noah already has a bedroom in Mr. Peterson’s home in Florida, and that the home is near Mr. Peterson’s work and within minutes of Noah’s prospective school.
(7) La. R.S. 9:355,14(A)(7): The reasons of each person for seeking' or opposing the relocation.
The court found that Callie was in good faith in terms of pursuing employment and wanting to be with her spouse. The court stated that Brandon opposed relocation because he believes that his relationship with the child will be diminished. However, it also appears that Brandon wants Callie to remain in Louisiana.
(8) La. R.S. 9:355.14(A)(8): The current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of the child.
The court found that Callie has completed her education, obtaining undergraduate and graduate degrees, and has a job that she has .conditionally accepted if she is allowed to relocate. The court also stated that Brandon has had the same type of employment his entire life and has indicated that he is a hard worker, works long hours, and has the type of job that requires him to constantly be on the road. Brandon stated that he would not leave his work under any circumstances.
(9) La. R.S. 9:855.14(A)(9): The extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation, including child support, spousal support, and community property, and alimentary obligations.
The testimony of Callie and Brandon shows that he has consistently paid child support and at times voluntarily provided more for .his son. Various text communications show that when Callie would request things on behalf of the child, Brandon would respond in assisting her to deal with the cost of tuition and other needs the child has had.
(10) La. R.S. 9:855.14(A)(10): The feasibility of a relocation by the objecting person.
The court stated that Brandon could not easily relocate or move closer to Florida. Brandon testified about his desire to live in the North Louisiana area due to his mother being ill, his own family ties to the area, and his residing back and forth between Huston and Monroe. The evidence shows that Brandon does not own or rent a home; he lives “on the road” and at times, is closer to Pensacola than he is to Ruston.
(11) La. R.S. 9:355.14(A)(11): Any history of substance abuse, harassment, or violence by either the person seeking or the person opposing relocation, including a consideration of the severity of the conduct and the failure or success of any attempts at rehabilitation.
The court found this factor to be inapplicable in this case.
(12) La. R.S. 9:355.14(A)(12): Any other factors affecting the best interest of the child.
As Noah approaches school age, it is imperative that he have predictability and consistency in his life. Additionally, Callie also needs some measure of ability to make plans for her family and herself. Since Noah will be starting kindergarten, his schedule will be much more regimented, and visitation will have to revolve around weekends, holidays, 117and summer vacation. Brandon will have to accommodate Noah’s school schedule anyway. Brandon is able to travel to jobs at a considera *1286 ble distance from Louisiana; therefore, he should be able to travel to see his son. There is little evidence in the record to bolster the trial court’s assertion that Callie has attempted to thwart Brandon’s relationship with Noah or that she will do so upon relocation. The trial court was clearly wrong and abused its discretion in making this determination.
Plaintiffs counsel submitted a proposed visitation schedule to the trial court. However, the trial court did not consider the schedule in light of its denial of plaintiffs request for relocation. We will remand this matter to the trial court to determine a custody and visitation schedule that is reasonable and fair to both parties.
CONCLUSION
The judgment of the trial court is REVERSED and the relief requested in the petition for authorization to relocate the child to Florida is granted. The case is REMANDED to the trial court for determination of a custody and visitation schedule. Costs of the appeal are assessed to defendant, Brandon Morris.
REVERSED AND REMANDED.

. The petition for rule nisi for authorization to relocate child’s residence states - that the child’s birthdate is 12/07/11,

. Gulf Breeze is a suburb of Pensacola.

. In brief, the parties refer to him as "Peder-sen.”

. La. R.S. 9:355.14(A) provides:
In reaching its decision regarding a proposed relocation, the court shall consider all relevant factors in determining whether relocation is in the best interest of the child, including the following:
(1) The nature, quality, extent of involve■ment, and duration of the relationship of the child with the person proposing relocation and with the non-relocating person, siblings, and other significant persons in the child’s life.
(2) The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child’s physical, educational, and emotional development.
(3) The feasibility of preserving a good relationship between the non-relocating .person and the child through suitable physical custody or visitation arrangements, considering the logistics and financial circumstances of the parties.
(4) The child’s views about the proposed relocation, taking into consideration the age and maturity of the child.
(5) Whether there is an established pattern of conduct by either the person seeking or the person opposing the relocation, either to promote or thwart the relationship of the child and the other party.
(6) How the relocation of the child will affect the general quality of life for the child, including but not limited to financial or emotional benefit and educational opportunity.
(7) The reasons of each person for seeking or opposing the relocation.
(8) The current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of the child.
(9) The extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation, including child support, spousal ‘support, and community property, and alimentary obligations.
(10) The feasibility of a relocation by the objecting person.
(11) Any history of substance abuse, harassment, or violence by either the person seeking or the person opposing relocation, including a consideration of the severity of the conduct and the failure or success of any attempts at rehabilitation.
(12) Any other factors affecting the best interest of the child.

. La. C.C. art. 134 provides:
The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child,
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.